**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

SIOBHAN DONEGAN,

Plaintiff,

v.

IRENE LIVINGSTON, TERRE FEINBERG, and FREDERICK MILL,

Defendants.

CIVIL ACTION NO. 3:11-cv-812

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court is Defendants' Motion for Summary Judgment. (Doc. 14.) Plaintiff Siobhan Donegan claims her rights under the First, Fourth, and Fourteenth Amendments were violated when she was detained and subjected to a Breathalyzer test by agents of her employer, the East Stroudsburg Area School District.[1] As the Court finds the test justified as a special needs search, Donegan's Fourth Amendment claim must fail. Moreover, as Donegan has failed to establish any infringement to her right of association under either the First or Fourteenth Amendments, that claim must also fail. Finally, in dismissing all of Donegan's claims predicated on federal question jurisdiction, the Court will decline to exercise supplemental jurisdiction over her remaining state-law claims.

## BACKGROUND

Plaintiff Siobhan Donegan was employed by the East Stroudsburg Area School District ("the District") as an instructional aide. (Defs.' Stmt. at ¶¶ 1-2.) She had been

[1] To any extent Donegan claims her Fifth Amendment rights were also violated, the Court finds no claim predicated on a violation of these rights and no argument in support of such a cause of action.

employed by the District since 2001, but was transferred from the High School to the East Stroudsburg Elementary School ("the School") in September of 2010 in order to fill a vacancy. (*Id.* at ¶¶ 1, 9-10.) Donegan was not happy about this transfer. (*Id.* at ¶ 11.) At her deposition, Donegan testified that she did not feel welcomed in her new position, but that Principal Livingston was "never nice to anyone" and, as such, "the teachers were petrified of her." (Donegan Dep 15:16-24, 21:14-24, 23:9-15, Sept. 27, 2011.) At all relevant times, Defendant Irene Livingston was the School's Principal, Defendant Frederick Mill was the Chief of Police of the East Stroudsburg Area School District Police Department, and Defendant Terre Feinberg was a Police Officer for the District's Police Department. (Defs.' Stmt. at ¶¶ 3, 7-8.)

On December 2, 2010, Donegan arrived at the School and clocked in. (*Id.* at ¶ 13.) She was asked to report to the Principal's Office to fill out some paperwork. (*Id.* at ¶ 14.) According to Principal Livingston, the secretary in the Principal's Office informed Livingston "that she could detect a smell of an alcohol . . . on Siobhan." (Livingston Dep. at 61:10-20, Sept. 27, 2011.) Principal Livingston then confirmed the "smell of alcohol" emanating from Donegan, and she then asked Donegan to come into her office once she was finished with the paperwork. (*Id.* at 62:11-18, 71: 71:5-23.) In having "felt that there was a detection of an alcoholic beverage," Livingston called her supervisor, Irene Duggins, the Assistant Superintendent for Curriculum and Instruction for the District. (*Id.* at 74:13-24; Defs.' Stmt. at ¶ 6.) Duggins explained that Donegan had left an "incoherent phone message" with the district office the night before and instructed Principal Livingston to detain Donegan in her office until further notice. (*Id.* at 74:25-75:6.) When Livingston finally asked Donegan if she

had been drinking, Donegan responded that she had not been this morning, but "had a couple of drinks last night" as she was upset that her Mom's plane had been struck by lightening and had to return to Ireland. (*Id.* at 75:11-17.) Conversely, Donegan testified that she never drinks alcohol. (Donegan Dep. 38:2-4, 52:18.) At any rate, Livingston stated that she "never accused [Donegan] of being intoxicated. Not then, not now." (Livingston Dep. 66:1-2.) Donegan, however, testified that she overheard Principal Livingston say to Duggins that she had "Siobhan Donegan standing here in front of me and she's intoxicated. And I cannot have her around my little students being intoxicated." (Donegan Dep. 30:15-23.) Donegan was extremely shocked to hear this. (*Id.* at 30:24-31:2.)

Duggins, having received the call from Principal Livingston, attempted to contact Superintendent Sharon Laverdure but was unable to get her on the phone. (Duggins Dep. at 23:15-17, 23:18-25:9, Nov. 4, 2011.) Laverdure recalled differently, expressing that she received Duggins's call but directed her to follow protocol and to contact Human Resources for specifics. (Laverdure Dep. 6:14-16, 9:14-10:7, Dec. 12, 2011.) In either event, Duggins called the personnel office for guidance on how to handle an employee suspected of being intoxicated. (Duggins Dep. at 23:15-17, 23:18-25:9.) The secretary at the personnel office explained that the protocol was to have the secretary call the hospital to prepare testing, to have Chief Mill escort the employee to the testing location, and to alert someone from the support staff to make sure the employee obtained union representation. (*Id.* at 25:20-26:4.) Duggins expressed that the "protocol was activated based on Mrs. Livingston's phone call." (*Id.* at 29:15-16.) Duggins then called Chief Mill and expressed the situation to him, specifically that Donegan needed to be transported to Pocono Medical Occupational Health and that she should be provided with union representation. (Defs.' Stmt. at ¶ 24.) While

Chief Mill was aware of the protocol (*Id.* at 26:23-24), Principal Livingston expressed that she had never seen such a written protocol. (Livingston Dep. 92:19-21.) Superintendent Laverdure confirmed that the pertinent protocol was not written, but was based on prior practice. (Laverdure Dep. 10:11-20.)

Principal Livingston then directed Donegan to step into a conference room to await transport to the Pocono Medical Center with Mill and Feinberg. (Defs.' Stmt. at ¶ 26.) Chief Mill had been summoned by Duggins, who informed Mill that there was a "situation" at the School "where a teacher's aide needed to be transported to Pocono Occupational Health." (Mill Dep. 10:22-25, 11:7-8.) Chief Mill[2] expressed that he choose not to initiate any investigation on his own accord, but that he also did not feel he had authority to disobey the transport order, either. (*Id.* at 26:14-27:20.) Upon arrival, Mill observed Donegan eating something outside the conference room, which Donegan explained was related to her diabetes. (Defs.' Stmt. at ¶¶ 27, 29.) Mill had requested that Officer Feinberg accompany him because he didn't "want to be in the car alone with a female." (Mill Dep. 12:23-13:3.) Mill and Feinberg explained to Donegan that she was going to be taken to the Pocono Medical center for a Breathalyzer test. (Defs.' Stmt. at ¶ 31.) Chief Mill testified that he made no representation to Donegan about whether she was free to leave or not, specifically declining to make any conversation with her so that "[s]he wouldn't feel like she was under arrest" and that he "was not about to make [Donegan] feel she had restricted movement at all." (Mill Dep. 34:2-16, 38:2-4.) Chief Mill further opined that "[a]t no time did [they] make her feel she was under arrest" and that he specifically told Donegan that they were there

---

[2] The record does not reflect all portions of Chief Mill's testimony as cited by the Plaintiff.

solely for transport. (*Id.* at 33:15-34:7, 27:14-20.) Donegan testified that Chief Mill asked her how she got to work that day in case she needed to be driven home. (Donegan Dep. 34:23-35:4.)

Officer Feinberg testified that Chief Mill communicated to her that the two of them were going to be transporting someone suspected of being under the influence of alcohol. (Feinberg Dep., 9:23-10:11, Nov. 18, 2011.) Feinberg, however, was unclear as to whether Donegan was free to leave, and thus never explained to Donegan whether or not she was free to go. (*Id.* at 23:15-24.) Finally, Feinberg indicated that while she did not smell alcohol on Donegan, that she smelled it in the entrance of the school and in the conference room and that it smelled like rubbing alcohol. (*Id.* at 37:7-38-9.)

Donegan represents that she was told to stay in the conference room and not to move, and when the two officers arrived, they similarly told her that she had to stay in the room. (Donegan Dep. 31:10-23, 66:12-15.) They were in their full police uniforms with guns, although they never told Donegan that she was under arrest and they never put her in handcuffs. (*Id.* at 66:20-23, 31:23-25.) Donegan admitted that she was not "formally arrested," but that when she asked the officers what they were going to do, they responded that they were "going to take [her] to Pocono Medical and we are going to have [her] blood alcohol." (*Id.* at 28:1-2, 32:3-4.) While Donegan had represented to the School officials–including Principal Livingston–that she was not intoxicated, Donegan was agreeable to taking the test in order to prove that she was not intoxicated and to keep her job. (*Id.* at 36:4-19.) Donegan admitted that she was not forcibly taken, stating that she was "very passive" as she knew she had done nothing wrong, but opined that they might have forced

her to go if she had protested. (*Id.* at 65:24-66:5.) Donegan requested that the Officers delay transport so that she did not have to be marched in front of a large number of people, and they acquiesced. (*Id.* at 66:24-67:6.) However, by the time they left, there were still late students and parents arriving. (*Id.* at 67:6-11.)

Chief Mill represented that he was alerted to the situation at 8:30 a.m. and that the test was administered at 9:01 a.m. (Mill Dep. 39:23-40:5.) The ride to the Pocono Medical Center was less than ten minutes. (Feinberg Dep 30:12-14.) When the technician presented Mill with the results, he did not look at them but instead took them back to human resources. (Mill Dep. at 37:5-13.) Donegan ultimately tested negative for alcohol and was given the rest of the day off with pay. (Defs.' Stmt. at ¶¶ 35, 38.) Upon being returned to the Elementary school, Donegan waited fifteen minutes for Livingston to return from an assembly, spoke briefly to Livingston, and clocked out by 9:45 a.m. (Donegan Dep. at 42:11-18, 60:2-62:7.)

Donegan filed her Complaint on April 27, 2011. (Doc. 1.) In it, she alleges generally that Principal Livingston fabricated the claim of public intoxication and had her arrested in an effort to embarrass her and force her to quit her job. Donegan further alleges that Defendants Mill and Feinberg knew that she was not intoxicated but still paraded her in front of students and parents at the School while in their custody. As such, Donegan brings two claims under 42 U.S.C. § 1983 for unlawful arrest and retaliatory filing of charges against all three Defendants. Donegan has also brought state law claims for unlawful arrest, slander, libel, and a false light invasion of privacy. This Motion is now ripe and is ready for the Court's review.

**LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.* Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* 2D Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2727 (2d ed. 1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial

burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256–57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id.* (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## DISCUSSION

### I. Unlawful Arrest (Count I)

Donegan alleges that she was arrested without probable cause and in violation of the Fourth Amendment for the charges of driving under the influence and public intoxication. Although this claim clearly stems from the Fourth Amendment's protections against "unreasonable searches and seizures," U.S. Const. amend. IV, the parties disagree as to whether the instant Fourth Amendment violation is one of search or seizure. However, in finding a lawful search, I will decline to find an unlawful seizure accompanying the search.

**A. Fourth Amendment Seizure**

The facts indicate that Donegan was never officially arrested for any crime, and I will evaluate her claim for unlawful arrest as an unreasonable seizure. *See Halpin v. City of Camden*, CIV. 05-2088 (RMB), 2007 WL 1521435, at *6 (D.N.J. May 21, 2007) *aff'd in part*, 310 F. App'x 532 (3d Cir. 2009) (noting that an unlawful arrest is not "a right in itself" but a violation of the Fourth Amendment right to be free of unreasonable seizures). However, whether viewed as an unlawful arrest or a plain unlawful seizure under the Fourth Amendment, the inquiry boils down to two questions: "Was there in fact a seizure? If so, was that seizure reasonable?" *United States v. Smith*, 575 F.3d 308, 313 (3d Cir. 2009); *see also Garlanger v. Verbeke*, 223 F. Supp. 2d 596, 607 (D.N.J. 2002) (citation omitted) ("To state a claim for unlawful arrest under section 1983, a plaintiff must plead that [s]he was arrested by a state actor without probable cause.").

Under the Fourth Amendment, a person has been seized where, "'in view of all the circumstances surrounding the incident, a reasonable person would have believed that [s]he was not free to leave.'" *Schneyder v. Smith*, 653 F.3d 313, 322 (3d Cir. 2011) (quoting *California v. Hodari D.*, 499 U.S. 621, 627-28 (1991)). Whether the hypothetical reasonable person would feel free to leave "is normally a question of law, to be determined from the circumstances as they developed." *Gilles v. Repicky*, 511 F.3d 239, 245 (2d Cir. 2007) (citation omitted). In the more typical situation, such as a driver suspected of driving while intoxicated, reasonable suspicion would provide the authority to stop and investigate while probable cause would be ultimately required to administer further sobriety tests. *See Pahle v. Colebrookdale Twp.*, 227 F. Supp. 2d 361, 371 (E.D. Pa. 2002) (finding that the Fourth Amendment's search and seizure requirements are triggered when a suspect is detained

and transported for a blood or breath test for alcohol). Thus, Donegan argues that an unlawful seizure occurred as she was detained by the three District officials without probable cause in a situation in which a reasonable person would not have felt free to leave.

Assuming without deciding that a reasonable person in Donegan's situation would not have felt free to leave, I conclude that the record does not support a finding of probable cause for such a seizure. "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995) (citation omitted). The events setting the seizure into motion were essentially limited to the smell of alcohol apparently emanating from Donegan's person. While this does suggest reasonable suspicion to further investigate, it does not alone indicate that Donegan was drunk. The smell of alcohol alone is not enough as many non-inebriating products contain alcohol, including hand sanitizer, mouthwash, and rubbing alcohol. Thus, while the Defendants had reasonable suspicion to detain Donegan, they did not have probable cause to arrest her.

**B. Fourth Amendment Search**

The Defendants argue that this case should not be viewed as a seizure, but as a "special needs" exception to the Fourth Amendment's warrant requirement. This exception acknowledges that in instances "where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S.

656, 665-66 (1989). In particular, searches which further a specified governmental need but are "not supported by the typical quantum of individualized suspicion, can nonetheless still be found constitutionally 'reasonable.'" *Neumeyer v. Beard*, 421 F.3d 210, 214 (3d Cir. 2005) (citations omitted).

The Defendants rely heavily on *Majewski v. Fischi*, 372 F. App'x 300 (3d Cir. 2010) in support of their argument that administering a Breathalyzer test to an elementary school employee does not require probable cause. In that case, a guard at a State correctional facility was forced to submit to a Breathalyzer test after employees observed signs of his intoxication. In "evaluating the constitutionality of an employee test for intoxication," the Third Circuit held that the search in *Majewski* was not unreasonable under the Fourth Amendment as it fell within the special needs exception. *Id.* at 303-04. In arriving at such a conclusion, a court must look to the "reasonableness" of the search, and which weighs the "intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" *Wilcher v. City of Wilmington*, 139 F.3d 366, 374 (3d Cir. 1998) (*quoting Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989)). This analysis specifically considers: "'(1) the nature of the privacy interest upon which the search intrudes; (2) the extent to which the search intrudes on the employee's privacy; and (3) the nature and immediacy of the governmental concern at issue, and the efficacy of the means employed by the government for meeting that concern.'" *Majewski*, 372 F. App'x at 303 (citing *Wilcher*, 139 F.3d at 374).

Administration of a Breathalyzer test to an elementary school employee passes this reasonableness test. The Supreme Court has specifically recognized the school environment as one which "presents 'special needs' beyond normal law enforcement that

may justify departures from the usual warrant and probable-cause requirements." *Skinner*, 489 U.S. at 620 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873-74 (1987)). Moreover, an analysis of the above factors demonstrates that an elementary school employee in Donegan's position could be properly subjected to a Breathalyzer test.

Like the corrections officer in *Majewski*, Donegan's profession subjected her to a reduced expectation of privacy in her sobriety while at work. Similar to railroad workers, teachers' privacy to ingest substances at work is "diminished by reasons of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees." *Skinner*, 489 U.S. at 627; *see also Knox County Educ. Ass'n v. Knox County Bd. of Educ.*, 158 F.3d 361, 384 (6th Cir. 1998) (noting that teachers play a unique role in their influence and access to children and "should not be surprised if their own use of drugs is subject to regulation and testing and, as such, their expectation of privacy, at least with respect to drugs and drug usage, might be diminished."); *but see Am. Fed'n of Teachers-W. Virginia, AFL-CIO v. Kanawha County Bd. of Educ.*, 592 F. Supp. 2d 883, 904 (S.D.W. Va. 2009) (declining to find teacher positions as safety sensitive on the record before that court). As teachers inhabit a highly regulated environment which is particularly sensitive to alcohol and drug abuse, I find that teachers have a reduced expectation of privacy in the use of such substances while at work.

The nature of the governmental interest–presumably maintaining a safe school environment–is obviously high. And, the particular invasion in this case is minimal in comparison–"breathalyzer tests are minimally intrusive." *Majewski*, 372 F. App'x at 304. They require no physical intrusion into the body and reveal no more information than necessary, uncovering only "the level of alcohol in the employee's bloodstream and nothing

more." *Skinner*, 489 U.S. at 625. The efficacy of administering them without a warrant it also compelling as the Supreme Court has further noted that it would be unreasonable to force warrant procedures on school officials "who would otherwise have no reason to be familiar with such procedures." *Id.* at 623-24. The government also has a heightened interest in the toxicological context where "the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." *Id.* at 623 (quoting *Camara v. Mun. Court of City & County of San Francisco*, 387 U.S. 523, 533 (1967)). Thus, on the balance, this sort of warrantless Breathalyzer testing of school employees based on reasonable suspicion is reasonable under the Fourth Amendment.

Other courts have agreed. In *Aubrey v. Sch. Bd. of Lafayette Parish*, 148 F.3d 559 (5th Cir. 1998), the Fifth Circuit upheld random urinalysis test of an elementary school custodian under the special needs exception. That Court found a substantial government interest in "prevent[ing] drug users from obtaining a safety sensitive positions." *Id.* at 563-64. In weighing this governmental interest against the individual's interest, the Court also noted that the custodian had notice he would be subject to random testing, and that "custodial employees 'reasonably should expect effective inquiry into their fitness.'" *Id.* at 564 (quoting *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 672 (1989)). That court finally noted that the intrusiveness of the search was minimal as the sample was produced in private and was narrowly tailored to detect only the presence of illegal substances, and not other health information. *Id.* From that, *Aubrey* concluded that the searches were reasonable as the governmental interest outweighed "the privacy interests of the employees in an elementary school who interact regularly with students." *Id.* at 565.

In *Knox County Educ. Ass'n v. Knox County Bd. of Educ.*, 158 F.3d 361, 367-69 (6th

Cir. 1998), the Sixth Circuit considered a school district policy that, in pertinent part, would have a teacher transported to a collection site for alcohol testing if there was reasonable suspicion that the individual was under the influence on a particular occasion. Upon review of that particular aspect of the policy, the Sixth Circuit found the policy presumably acceptable excepting that the low threshold for a positive result–.02 percent or only one-fifth of what would constitute driving drunk–was reasonably related to the purpose of the testing.[3] *Id.* at 386. Specifically, that Court noted that the test might implicate people who were drinking off of the job and the record did not reflect "why the Board believes impairment at the relatively low .02 level is significant, and how that level is related to the purpose of the testing." *Id.*

The purpose of the above analysis is not to review the constitutionality of the of the District's unwritten policy of subjecting employees to Breathalyzer tests based on reasonable suspicion. This question is not raised by either party and is simply not at issue in the current matter. Instead, in finding that such policies are constitutionally permissible as a general matter, I only determine that this particular search did not violate Donegan's Fourth Amendment rights.

**C. Search Versus Seizure**

The parties' divergent analyses present a conundrum. The facts suggest, and no party denies, that Donegan was legally searched pursuant to the Fourth Amendment. Yet, since the record suggests only reasonable suspicion to believe that Donegan was intoxicated, her seizure would have been unlawful for lack of probable cause (assuming, of

[3] Of course, the instant record does not indicate the threshold for sanctions to attach and as Donegan tested at a level of .000 percent, this is not at issue in this matter.

course, that she was actually seized). I, however, view this seizure as an inherent element of the lawful search. The aforementioned special needs cases do not analyze the individual seizure inherent to a sobriety test. Most compelling, however, is the policy analyzed in *Knox* which, like the matter *sub judice*, specifically included transport of the suspected employee to a testing facility for a Breathalyzer analysis. While such transport may constitute a seizure, it is a natural consequence of the larger search which is thus the most pertinent constitutional aspect to be analyzed.

The Tenth Circuit has explicitly agreed with this analysis, explaining that, while analyzing the special-needs exception, "drawing a sharp distinction between search cases and seizure cases is unhelpful . . . because the extraction and analysis of bodily fluids may constitute a seizure as well as a search." *Nicholas v. Goord*, 430 F.3d 652, 663 n.21 (2d Cir. 2005). This is a sensible approach as the special needs exception also extends to special needs seizures. *See Illinois v. Lidster*, 540 U.S. 419, 424 (2004) (applying the special-needs doctrine to seizures constituting "brief, information-seeking highway stops"); *United States v. Kimler*, 335 F.3d 1132, 1146 (10th Cir. 2003) (holding that the DNA Act is both a "reasonable search and seizure under the special needs exception to the Fourth Amendment's warrant requirement"); *KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 647 F. Supp. 2d 857, 879 (N.D. Ohio 2009) (analyzing special needs searches and seizures coextensively).

Moreover, in parallel contexts, a *Terry* stop allows suspects to be held pursuant to reasonable suspicion where "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that

criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). This brief detainment is a well-established exception to the general requirement that a seizure be founded on a warrant based on probable cause. *United States v. Johnson*, 592 F.3d 442, 447 (3d Cir. 2010) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). Even though such a stop requires only reasonable suspicion, a suspect is not free to leave and may not discontinue such a stop. *United States v. Leal*, 235 F. App'x 937, 941 (3d Cir. 2007). However, while there is "no rigid time limitation on *Terry* stops," *Terry* does not bestow police with the ability to indefinitely hold a suspect, and at some point a *Terry* stop will become a *de facto* arrest. *United States v. Sharpe*, 470 U.S. 675, 685 (1985); *United States v. Johnson*, 592 F.3d 442, 447-48 (3d Cir. 2010) ("it can be difficult to distinguish between a Terry stop, which requires only reasonable suspicion, and a de facto arrest, which must be supported by probable cause.").

Here, Donegan's detainment pending the Breathalyzer test is sufficiently analogous to a *Terry* stop to satisfy the Fourth Amendment's special needs exception. It was founded on reasonable suspicion, was designed to further investigate this particularized suspicion, and was no longer than necessary to complete that investigation. The record shows that the Officers took Donegan straight to the testing center and returned her right away. Specifically, only about one hour elapsed from the time the Chief Mill was summoned until Donegan was actually returned to the Elementary school. In fact, the record shows that this process was delayed at Donegan's request to avoid traffic in the school lobby and to protect Donegan's privacy to an extent possible. Thus, in finding the search reasonable, I find the accompanying seizure based on reasonable suspicion also reasonable under the Fourth

Amendment. Donegan's claim for a Fourth Amendment violation will therefore be dismissed with prejudice.[4]

## II. Retaliatory Filing of Charges

Donegan's second claim is against all parties for retaliatory filing of charges. In particular, Donegan avers that the Defendants engaged in a civil conspiracy to publicly embarrass her in violation of the First and Fourteenth Amendments by subjecting to her an arrest and "perp walk" in front of others present at the school which was in retaliation for her transfer to the elementary school. (Compl. at ¶ 26, Doc. 1.)

The cause of action behind this claim is elusive, though it appears that Donegan alleges that the humiliation caused by her detainment was manufactured with intent to undermine Donegan's relationships with her co-workers. In her brief, Donegan abandons any reference to the Fourteenth Amendment and declares only that "when adverse action is taken against an employee to intimidate [that] employee's association with others, the right of fair association of the First Amendment is implemented." (Pl.'s Br. at 10, Doc. 17). However, there are two types of associations protected by the Constitution which will need to be addressed: intimate and expressive. *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 441 (3d Cir. 2000).

Donegan's claim cannot be founded on intimate association as there is no claim that her association with any insular group was affected by these events. Intimate association

---

[4]To any extent it could be argued that Donegan was detained *prior* to the decision to administer a Breathalyzer and that the special needs exception would not apply to that period, I find this period sufficiently analogous to a *Terry* stop to also be Constitutionally permissible. Principal Livingston had reasonable suspicion to suspect that Donegan had been drinking. Livingston then arguably detained Donegan in the conference room while Livingston contacted her superiors about how to proceed, eventually being told that protocol required the administration of a Breathalyzer. This limited time period, initiated by reasonable suspicion, was used to appraise facts and decide how to proceed.

"involves an individual's right to enter into and maintain intimate or private relationships free of state intrusion." *Pi Lambda*, 229 F.3d at 441. Though rooted in the Fourteenth Amendment, *Behar v. Pennsylvania Dept. of Transp.*, 791 F. Supp. 2d 383, 414 (M.D. Pa. 2011), the aim of this protection is to nurture the "certain kinds of personal bonds [that] have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs" and "reflect[] the realization that individuals draw much of their emotional enrichment from close ties with others." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619 (1984). The Supreme Court has limited this protection to the sort of relationships that reflect the above qualities and "are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.* at 620. In other words, the right to "[i]ntimate association protects the closest and most interdependent of human relationships against state interference." *Schultz*, 304 F. App'x at 120. Donegan points to no such intimate relationship that was jeopardized by the Defendants and this claim cannot proceed as a violation of intimate association.

Donegan similarly fails to establish that her expressive association was in any way impinged. Expressive association, "recognize[s] a right to associate for the purpose of engaging in those activities protected by the First Amendment–speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts*, 468 U.S. at 618. As such, "[a] social group is not protected unless it engages in expressive activity such as taking a stance on an issue of public, political, social, or cultural importance." *Schultz v. Wilson*, 304 F. App'x 116, 120 (3d Cir. 2008) (citing *Pi Lambda*, 229 F.3d at 444). In her brief,

Donegan relies only on a Supreme Court of Missouri case from 1969 which found a "violation of both statutory and constitutional rights" where union members were fired or demoted by virtue of their having exercised their rights to join such labor organizations. *State ex rel. Missey v. City of Cabool*, 441 S.W.2d 35, 38, 44 (Mo. 1969). While those facts suggest retaliation for the exercise of a protected activity–namely association with a labor union–Donegan puts forth no facts suggesting that she engaged in any similar act of expression.

Therefore, as there is no evidence that Donegan's freedom of association was violated under either theory, this claim will be dismissed with prejudice.

**III. Remaining Claims**

Donegan's remaining claims are actions under state law for unlawful arrest, slander, libel, and false light invasion of privacy. District courts have supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A district court may refuse to exercise such jurisdiction where, as in the instant case, "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In fact, "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir.1995).

Here, I find no affirmative justification for exercising supplemental jurisdiction beyond

any ordinary inconvenience associated with dismissal on this ground. Therefore, as Donegan's constitutional claims will be dismissed, I will decline to exercise supplemental jurisdiction over the remaining state-law claims and these actions will be dismissed without prejudice to allow Donegan to re-file them in state court if she so desires.

## CONCLUSION

Plaintiff Siobhan Donegan's claim under the Fourth Amendment will be dismissed with prejudice as her limited search and detention were reasonable as a special needs exception to the Fourth Amendment. Her claims for freedom of association (retaliatory filing of charges) will also be dismissed with prejudice as Donegan has failed to establish that she had engaged in any protected, expressive conduct. Finally, in dismissing Donegan's federal question claims, I will also decline to exercise supplemental jurisdiction over her state law claims. I will dismiss those claims without prejudice and will direct the Clerk of Court to mark this case as closed.

An appropriate order follows.

July 3, 2012
Date

/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge